**1819.**
**DECEMBER.**

Mactier
vs
Wirgman.

## MACTIER vs. WIRGMAN, et al.

APPEAL from *Baltimore* County Court. *Assumpsit* for money had and received, lent and advanced, laid out and expended, and on an *insimul computassent.* Pleas, the general issue. At the trial the plaintiff, (now appellant,) offered in evidence a charter party of affreightment under seal, dated the 25th of April 1810, executed between the plaintiff, together with several other shippers, and the defendants, (the appellees,) owners of the ship or vessel called the *William Wilson,* whereof *P. Wirgman,* one of the defendants, was master, of the burthen of, &c. lying in the port of *Baltimore.* Covenant by the owners, that the ship should be tight, &c. and that the master would receive and take, and the freighters should load, and put on board the said ship, a cargo of lawful and permitted goods, &c. and being so laden, the master should proceed with the ship from the port of *Baltimore,* north about, for the port of *Sylt.* "And if on arrival there it can be ascertained that the ports of *Hamburg* and *Bremen* are open to the admission of *American* vessels, that the said master shall forthwith proceed to whichsoever the said ports the supercargo and himself shall think most for the interest of the freighters. But should the said ports of *Hamburg* and *Bremen* continue closed, then the said cargo shall be landed at *Sylt,* if permitted; and in case of refusal to permit the same to be landed at *Sylt,* that then the said master shall proceed therewith to such permitted port in the *North Sea,* or the *Baltic,* as he, and the supercargo, shall order and direct. And should the *Baltic* be also closed against the admission of *American* vessels, in such case the said master shall proceed with the said cargo to such other port as he and the said supercargo may in their judgment think most proper. And that on the arrival of the said ship at the port of delivery, the said master shall and will make a right and true discharge of the said cargo to the said supercargo, or to such other agent, factor or consignee, of the freighters, as they may direct, agreeably to bills of lading to be signed for the same, and so end and finish the said intended voyage; the dangers of the seas, restraint of rulers, and princes, fire, pirates and enemies, only, excepted." The freighters covenanted to pay freight agreeably to the bill of lading; "provided the said cargo be discharged at a port in the *North Sea;* but if delivered at any port in the *Baltic,* not higher than *Kiel* or *Colberg,* then the said freighters covenant, &c. to pay unto the owners an advance of 10 p. c. on the amount of the freight money stipulated by the said bills of lading. If higher that *Kiel* or *Colberg,* and not higher than *Konigsburg,* a like advance of 15 p. c. and if higher than *Konigsburg* a like advance of 20 p. c. And should

In assumpsit to recover a sum of money retained by the defendants, on account of freight, out of the proceeds of that part of the cargo which was the property of the plaintiff—Held, that the contract between the parties, as collected from the charter party, and a subsequent agreement, was that the goods shipped by the plaintiff should not be landed on the island of Sylt, but at some permitted port on the continent of Europe, before any freight should be earned; but in the event of the whole of the ports on the continent being shut, then, and not otherwise, the defendants should be entitled to freight on the goods being landed in England, with a stipulated addition. That by the term 'shut,' was meant an occlusion, by the municipal regulations of the country. That the ship owners had a right to make any other contract they pleased with the plaintiff, varying or annulling the charter party, in relation to his part of the cargo. That whether it would or would not have been expedient to attempt the landing of the cargo on the continent, was not a matter for the jury. That the only question for the jury was, whether the whole of the ports on the continent of Europe, were, by the municipal regulations, closed against the admission of the goods of the plaintiff? If they were, the vessel earned freight by going to England; if on the contrary any of them were open to such goods, the defendant had no right, under the stipulations in the agreement, to charge freight on landing them in England; and the plaintiff was entitled to recover any sum of money retained by the defendants on that account, notwithstanding the distracted state of Europe might have rendered it hazardous to seek such open ports.

the *Baltic* be shut, such further advance on said freight as shall be settled by arbitration, together with 5 p. c. primage, on whichsoever sums shall be earned as aforesaid; which said sums shall be deemed and taken in full of freight, primage, &c. and that the said freight, money and primage, shall be paid immediately on the delivery of the said cargo," &c. The plaintiff also offered in evidence a bill of lading for that part of the cargo shipped by the plaintiff on board the ship *William Wilson*, (the ship named in the charter party, dated the 8th of May 1810,) *P. Wirgman*, one of the defendants, master, bound from the port of *Baltimore* for *Sylt*, and a permitted port in the *North Sea* or *Baltic*, mentioning the goods laden, and that the goods were shipped "for account and risk of the shipper, a citizen of the *U. S.* of *America*, and resident merchant of *Baltimore*, to be delivered in the like good order and well conditioned, at the aforesaid permitted port, (the dangers of the seas only excepted,) unto Messrs. *David Parish & Co. Hamburg*, or to their assigns, he or they paying freight for the said goods at the rate of four pounds sterling per ton for logwood, and Nicaragua wood, nine shillings sterling pr. hundred weight for sugar, and eight shillings sterling per hundred pounds for coffee, with five per cent primage, with primage and average accustomed." He also offered in evidence the following agreement, dated the 14th of May 1810, made and entered into by the defendants at the plaintiff's request, and by them addressed and delivered to the plaintiff, "we hereby agree and acknowledge that the sundry goods shipped by you on board the ship *William Wilson, Peter Wirgman*, master, are to be landed in a permitted port on the continent of *Europe*, (meaning that they are not to be landed on the island of *Sylt*,) before the freight is earned. But should the whole of the continent be shut, the freight, with an addition, (as arbitrators may determine,) will be earned should the property be landed in *England* agreeable to the custom of the country." He also offered in evidence copies of the three following letters of instruction from him, the plaintiff, to Messrs. *Parish & Co.* of *Hamburg*, dated at Baltimore on the 8th, 9th. and 14th of May 1810. 1. "Through the recommendation of our mutual good friends Messrs. *Robert Gilmor & Sons*, I have taken the liberty of enclosing you invoice and bill of lading for sugar, coffee and dye woods, of the first quality, shipped on board the ship *William Wilson, Peter Wirgman*, master, to your address, bound for *Sylt*, and a permitted port in the *North Sea* or *Baltic*, the call at *Sylt* is merely with a view to get information if your port is open to admit her cargo; if so, it is my wish to dispose of my property immediately on its arrival, to the best possible advantage, provided you do not see a prospect of better markets, in which case you will be guided by your own judgment. However, I would prefer a sale if a small profit could be obtained. If a sale is effected at your port, I wish you to remit, as soon as possible after the arrival of

the goods, to my friends Messrs. *John Heathcote & Co.* *London,* as large an advance as you can conveniently make, and when sales are closed, the nett proceeds, advising the same. It is to be observed the ship is not discharged from her freight until the cargo is landed in a port on the continent of *Europe.* Should your port not admit the entry of her cargo, in that case you will address my property to your friends in a port where it will be admitted, and you judge it will turn out most to my advantage. On account of the unsettled state of affairs, and captain *Wirgman* being a particular friend of mine, should the property be denied an entry at your port, and the ship proceed to where you have no friends to confide in, in that case you will consult with captain *Wirgman* for the safety of my property, giving him such instructions as you may judge most for my interest, when you will order remittances, as before directed, if exchange is in favour, if not, let the nett proceeds be shipped me by the first opportunity in canvass, Russia duck, and brown sheeting, a proportionable quantity of each. The reason why I have been so particular in the bills of lading respecting the logwood, is that I was informed that part had been sawed and split, in order to make stowage, though the former owner of the ship denies it. However, if this is not the case, the number of pieces and weight will be found correct, as per bill of lading. Hoping this venture may arrive to a good market, and that you will exert yourself for my interest, I remain," &c. 2. "In case a remittance in bills should not prove favourable, I have thought proper to inclose a list of articles that would answer, provided they were of good qualities, purchased at the stipulated prices, and shipped immediately direct to this port at moderate freight, but still would prefer the bills. List of burlaps or halblacken in bales of 100 ells, 5 bales," &c. "or a proportionable quantity of the foregoing articles to the amount of the funds in hand, in case of shipment." 3. "Since writing to you the shippers generally on board the *William Wilson* have deemed it expedient to enter into a stipulation or charter party with the owners, in case your port should not be open to receive her cargo. As this instrument of writing seems to be called for in your ports, I have thought proper to sign the same, though it is in no case to invalidate the bill of lading, further than to allow the additional freights stipulated, in case she should proceed further than the two first ports, as you will observe by the enclosed letter from the owners. Be particular in forwarding certificates of landing." The originals of these letters were put into the possession of *Peter Wirgman,* previous to his leaving the port of *Baltimore* on the voyage aforesaid, and were afterwards opened by the crew of a privateer that captured the ship *William Wilson,* and were restored to *Peter Wirgman* on the acquittal of the ship by the prize court of *Christiansand.* The plaintiff further offered in evidence the following letter of instructions, written by the plaintiff, also dated the 8th of May 1810, and

1819.

Mactier
vs
Wirgman

addressed and delivered to *Peter Wirgman*, one of the defendants, and who was, as before stated, master of the ship. "On account of the unsettled state of affairs on the continent of *Europe*, I have thought proper to request my friends Messrs. *Parish* & *Co.* of *Hamburg*, in the event of the cargo of the *William Wilson* being denied entry at their port, to consult with you on the further destination of the ship, and the disposal of my interest on board. In case they have no friend at the port she may proceed for, you will please to take charge of it, and advise with them what is best to be done for my interest. On your arrival off *Sylt*, should the situation of affairs be such as to prevent you from communicating with Messrs. *Parish* & *Co.* in that case you will have to proceed with the cargo where you judge it will be most advantageous for all concerned, when I shall consider my part as entirely under your charge, referring you for government to my letter of instructions to Messrs. *Parish* & *Co.* which in that case you will open. You will, no doubt, have occasion to get assistance in sales; be particular in applying to a house of the first respectability, taking care to get the business closed if possible before your departure. Any attention paid to the delivery of my interest will be thankfully acknowledged, and shall satisfy you for any trouble or expense you may be at for the safety and security of the same. The reason why I have been so particular in the bills of lading respecting the logwood, is that I was informed part had been sawed and split in order to make stowage, which was contrary to agreement, though the former owner, Mr. *Levering*, denies it. However, if this should not be the case, the number of pieces and weight will be found correct as pr bill of lading. Satisfied that your best exertions will be used to promote my interest, and wish you a safe and prosperous voyage." The plaintiff further offered in evidence the five following letters from *P. Wirgman* to Messrs. *Parish* & *Co.* respectively dated the 13th of July, 14th of September, the 14th of October, and the 8th and 10th of November 1810, 1. Dated at *Hitteroe*, the 13th of July 1810. "It is with real concern I apprise you of the capture of the ship *Wm. Wilson* on the 29th June, (by a *Danish* privateer,) on board of which, as you doubtless are informed, I have the care of property shipped by *Alexander Mactier*, Esqr. therefore I take the liberty of soliciting, as early as possible, your advice, and any information you conceive will conduce to his interest, which will very much oblige," &c. 2. Dated at *Flekkefiord*, the 14th of September 1810. "I had this pleasure, 13th July, apprising you of the unfortunate detention of ship *Wm. Wilson* and cargo, considerable part of which is to your address, as no doubt you are advised by duplicate. I then craved your advice respecting our future destination, but a more extensive knowledge of prize cases induces me to believe was I in possession of it, it would be of no advantage, as to be *Americans*, however accurate

their papers, and uncontaminated their neutrality, is suffi-cient cause, under frivolous pretences to force us through the court of appeals, and by that means ruin our specula-tions.    In 3 or 4 weeks we expect the promulgation of our sentence at *Christiansand,* and should I find it necessary I shall return home and collect uncontrovertible proofs of the facts we have already stated." 3. Dated at *Christi-ansand,* the 14th of October 1810.   "I yesterday had the pleasure of receiving your much esteemed favour of the 2d inst. and regret my absence from the ship prevents my de-tailing the particular quantity of the articles to your ad-dress, which consists chiefly of sugar, coffee and logwood, amount to about $30,000,   shipped by Mr. *Alexander Mactier* of *Baltimore,* who, as well as our house, have let-ters to you from our mutual friends *Robert Gilmor & Sons.* I can only account for your not receiving invoices and bills of lading, by the bearers of the duplicates being equally unfortunate with ourselves, and their letters con-sequently detained in the prize courts, as several hundred we brought are in that situation, many of which contain large remittances.  · I am now in daily expectation of our sentence, of which you may depend upon being immedi-ately advised." 4. Dated at *Christiansand,* the 8th of November 1810.   "I had this pleasure 14th ultimo, in con-formity to which I have the satisfaction of announcing on the 5th inst. my ship's papers were returned in pursuance to the sentence of the prize court, from which no appeal was entered.   The situation of the property still causes me much anxiety, and the numerous dangers that envelope us have induced the determination of discharging the cargo in *Flekkefiord,* where the ship at present lays, for which purpose we have petitioned the Prince Regent, and from our arrival being prior to these recent regulations, antici-pate a favourable result." 5. Dated at *Christiansand,* on the 10th of November 1810.   "I had this pleasure the 8th inst. since which I am favoured with your esteemed communication of 30th ultimo, and cannot but express my gratitude for your provisions for our case, through your friends Messrs. *Duntzfelt & Co.* which I feel a persuasion would have been of essential service, but am happy I shall have no occasion to avail myself of it, as the captors very prudently decline to enter an appeal.   I regret your letter does not contain any favourable information upon which we might be induced to alter our determination of unload-ing in *Flekkefiord,* which I intend commencing on Wednes-day next." The plaintiff also offered in evidence two letters from Messrs. *Parish & Co.* to *P. Wirgman,* dated at *Flek-kefiord, Hamburg,* on 2d and 30th of October 1801; that of the 2d of October, acknowledged the receipt of his letter of the 14th ultimo, referring to another of the 13th of July, which they had not received; and stating that they had never received any information respecting the consignment by the *William Wilson,* except from their mutual friends Messrs. *Widow, John Langs, & Son, Bremen,* who mere-

ly mentioned that part of the cargo was to their (the *Parish's*) consignment. That they should have been very happy to render their services useful to him during his unfortunate detention in *Norway*, through the medium of their agents, in advising with him respecting his future proceedings after sentence had been pronounced at *Christiansand*, and as very few escaped condemnation at the prize courts in *Norway*, they must suppose his case would not prove an exception, and the appeal carried to the high court of admiralty in *Copenhagen*, where his presence would be necessary. They requested him to inform them who were the shippers of the consignment to their address, and to forward any letters he might have for them, with any other information that might be useful. That if he proceeded to *Copenhagen*, their friends Messrs. *Duntzfelt & Co.* would cheerfully render him every service in their power for that purpose. That all the *Danish* ports being shut against the admission of vessels loaded with colonial produce, it became no easy matter to point out a proper destination for the *William Wilson*, after she should be liberated; but on this subject they had time enough to correspond after they should be informed by him of the goods he had on hand. That several of their friends, however, proceeded from *Gottenburg* to *Carlsham*, there to unload their cargoes, from whence, during the winter, goods might be transported by degrees to the opposite coast, by making arrangements for their admission at the different *Prussian* ports. That their partner, *J. Parish,* jr. was then in *Sweden*, and would be happy to afford him his assistance and advice, &c. The letter of the 30th of October 1810, acknowledged the receipt of his letter of the 14th inst. in answer to theirs of the 2d, and that they observed the goods he had to their consignment consisted of sugar. coffee and logwood, amounting to $30,000, shipped by Mr. *A. Mactier,* who, as well as his house, had letters to them from their mutual friends Messrs. *R. Gilmor & Sons;* that these letters, they observed, were detained in the prize court. That until then they were without any direct intelligence of this shipment. They were anxiously waiting to hear the result of his sentence, but apprehended it would not prove favourable; in this event he would be under the necessity of proceeding towards *Copenhagen,* to attend to the appeal in the high court of admiralty at *Copenhagen,* where their friends. Messrs. *Duntzfelt & Co.* would use every exertion in his favour. That he would be informed by the public papers of the late *French* and *Danish* decrees respecting colonial produce—of the heavy duties laid on both there and in *Holstein.* That under existing circumstances it would become a difficult matter to point out a proper port of discharge, so many changes taking place, and that if any further alterations should take place, they should keep him informed. The plaintiff further offered in evidence, that the ship *William Wilson* sailed on the voyage mentioned in the charter party, with the

1819.

Mactier
vs
Wirgman

goods and merchandize mentioned in the bill of lading;
and that while on her voyage, and before her arrival at the
island of *Sylt*, she was captured on the 29th of June in the
said year, by a *Danish* privateer, and carried to the port of
*Hitteroe*, in *Norway*, and subjected to admiralty proceed-
ings as prize by the captors.   That the admiralty court fi-
nally decreed the restoration of the ship and cargo on the
18th of November following, and caused her on that day
to be delivered up to *P. Wirgman*   He further offered in
evidence certain depositions, taken under commissions is-
sued in this cause at his instance, to *Salem* in *Massachu-
setts*, and to *Philadelphia* in *Pennsylvania*, for the purpose
of proving in what manner certain supercargoes and others
conducted themselves, who sailed in vessels on voyages to
the north of *Europe*, during the years 1809, 1810 and
1811, and the state of the different ports, &c. during these
years.   He further offered in evidence, that the ports of
*Denmark, Sweden, Prussia* and *Russia*, in the *Baltic*,
were at that time open to *American* vessels, and the ship
*William Wilson* could with safety have proceeded to any
of the ports of *Denmark, Sweden, Prussia* and *Russia*,
and delivered and sold her cargo to advantage; and that
other *American* vessels did, about that time, proceed up the
*Baltic*, and deliver and sell their cargoes; but that *P. Wirg-
man*, instead of proceeding thither, sailed from *Norway*
directly to the port of *Hull* in *England*, and there deliver-
ed the cargo of the said ship to Messrs. *Borthus* & *Bos-
ter*, resident merchants of *London*, whom he selected and
chose for that purpose.   That *E. Thomman*, the supercar-
go, who was placed on board the said ship by the other
shippers, but who had no control over the goods and mer-
chandize of the plaintiff, was left in *Norway* when the ship
sailed as aforesaid. He further offered in evidence, that the
defendants received from Messrs. *Borthus & Boster*, to
whom the cargo was delivered as aforesaid, from the pro-
ceeds of that part thereof which belonged to the plaintiff,
the sum of $2196 61, the freight stipulated in the bill of
lading, for the transportation of the plaintiff's goods and
merchandize; and also the further sum of $2450 36, as ad-
ditional freight, for landing the same at *Hull* in *England*;
and also the sum of $185 88 for demurrage.   He further
gave in evidence, that *P. Wirgman*, after leaving the port
of *Flekkefiord*, in *Norway*, did not proceed to the island of
*Sylt*, where he might have gone, the same being an open
and free port, and that the cargo would have been permit-
ted to be there landed.   He also offered in evidence, that
in the understanding of the merchants of *Baltimore*, when
the contract of charter was executed, a permitted port in
the *North Sea* was understood to apply to a port on the
continent of *Europe* only.   The defendants then gave in
evidence, that *P. Wirgman* and *E. Thomman* applied
to the *Danish* government for liberty to unlade and dis-
pose of the cargo of the *William Wilson*, after restoration,
at the port of *Flekkefiord*, in *Norway*, where she lay,

which application was depending until about the 1st of December 1810, when it was refused, and *P. Wirgman* was ordered by the *Danish* government to leave *Denmark*. The only evidence offered of that fact was the evidence of *H. Campbell*, one of the crew of the ship, that the pilot who navigated the ship from *Flekkefiord*, stated, on coming on board of the vessel, in the presence and hearing of the crew, and in answer to a question by one of them, that he was directed to take the vessel to sea without delay, but did not state by whom or by what authority such direction was given. The defendants further offered evidence to prove, that the cargo of the plaintiff was colonial produce, and that an *American* vessel, laden with colonial produce, could not proceed to any part of the *Baltic*, nor to any port of the continental powers in the *North Sea*, without imminent risk of having the ship and cargo seized and confiscated under the orders and decrees of the several continental powers, for the purpose of enforcing, what was called, the continental system of the Emperor of *France*. That it was extremely hazardous, if not impracticable, at that season of the year, to prosecute a voyage from *Flekkefiord* up the *Baltic*, from the severity of the season and climate, and that no prudent navigator would voluntarily have attempted it; and that *French* and *Danish* privateers were very numerous in that sea, and captured all *American* vessels that they fell in with; and that condemnation followed all *French* captures. They further gave in evidence, that *P. Wirgman*, under these circumstances, believed that the only prudent and safe course for him to pursue, was to proceed to *Hull* in *England*, a port in the *North Sea*, where he accordingly did proceed, and safely delivered the cargo as stated in the plaintiff's evidence. They further offered in evidence, that *E. Thomman* concurred and assented to the ship's proceeding to *Hull* under the circumstances aforesaid; and that although *P. Wirgman* applied for advice and instructions, (as appears by his letters to *Parish & Co.* set out in the plaintiff's evidence,) to *Parish & Co.* he obtained from them no other advice or directions than what is contained in the letters from *Parish & Co.* to *P. Wirgman*, also given in evidence by the plaintiff. They further offered in evidence, that the Island *Sylt*, is a part of *Holstein*, within the dominions of *Denmark*, and that the orders and decrees of the *Danish* government, in execution of the continental system, applied as well to *Sylt* as any other part of the *Danish* dominions, and that an *American* vessel with colonial produce on board, was as liable to seizure at *Sylt* as in any other port in *Denmark*. They further offered in evidence that the port of *Hull* is a port in the *North Sea*; and that there is no custom of merchants, or usage of trade among the merchants of *Baltimore*, which confines the expression of "a port in the *North Sea*," to a port on the continent of *Europe*. The defendants then moved the court to direct the jury, that *P. Wirgman*, by the charter party, the me-

morandum, and the letters of instructions from the plain-
tiff to him, was the agent of the plaintiff, with discretionary
powers; and if the jury should be of opinion from the
evidence that *P. Wirgman,* in the exercise of an honest
discretion, believed, either from the inclemency of the sea-
son and climate, or from the political state of the continent
of *Europe,* or from dangers of capture by privateers, it was
unsafe or inexpedient to attempt to land the cargo in any
of the ports of the continent, or the *North Sea* or the *Baltic,*
that then he was justified in proceeding to *England,* and was
entitled to the additional freight stipulated in the agreement
of the 14th of May 1810.    That at all events, whatever the
jury might believe in these respects, that *Hull* was a port for
delivery of the cargo both in the charter party and the said
agreement, and therefore that the plaintiff was not entitled
to recover.    That if *P. Wirgman,* in his character of super-
cargo, or agent for the plaintiff, relative to the manage-
ment of the plaintiff's cargo, caused the goods to be de-
livered at *Hull,* then the defendants were entitled to freight,
and the plaintiff could not recover.    Upon this prayer the
Court, [*Ward,* A. J.] gave the following direction to the
jury.    The facts in this case are so material for the solu-
tion of the contract of the parties, which like all other con-
tracts must be determined according to its legal intent,
that it is rather to be regretted that any question should be
withdrawn from the jury, which it appears to the court, is
the competent tribunal to adjudge all the law arising from
the proof in the cause.    As a prayer has been made it must
be given, refused or modified.    The court have carefully
examined and compared the agreement, instructions and
correspondence.    A charter party, bearing date the 25th
of April 1810, has been given in evidence, and whatever
ambiguity it contains is removed by a subsequent agree-
ment dated on the 10th of May following.    By the latter
it is stipulated that the goods are to be landed in a permit-
ted port, in a particular sea, on the continent of *Europe,*
before the freight is earned; meaning that they are not
to be landed on the island of *Sylt;* and should the con-
tinent be shut, the freight, with an addition, shall be earn-
ed, should the property be delivered in *England.*    From
this subsequent agreement it is evident that *Hull* was not a
port within the contemplation of the charter party.    How
far the testimony may go to show that the ports of the con-
tinent were shut, is a matter of fact not within the province
of the court, but for the jury to determine.    If the jury
should be of opinion that the ports were closed, then *P.
Wirgman* was justified, as the agent of the plaintiff, in de-
livering the cargo in *England.*    The letter from the plain-
tiff to *Parish* & *Co.* directed them to consult with him as
his agent.  *Wirgman* asked their advice, but received none,
and thereby, in the opinion of the court, *Wirgman* was
placed in the same situation as if he had been cut off from
all communication with them; in which event he was ex-
pressly authorised to act according to discretion.    The

court cannot lay their hand on any letter of the plaintiff's which goes to the *Wirgman* down to the instructions of *Parish* & *Co.* or to preclude him absolutely from acting without them, on the contrary it is manifest that the plaintiff considered *P. Wirgman* an agent, in whom he had vested discretionary powers. It follows, therefore, if the jury should believe that the ports of the continent were closed within the meaning of the articles of agreement, the owners of the vessel were entitled to freight; or if the jury should believe from the state of the ports, intended to be included by the agreement, that it was inexpedient to attempt the landing of the cargo on the continent, *P. Wirgman* was authorised to proceed to *England*, and land his cargo. The vessel consequently earned freight. To this direction the plaintiff excepted; and the verdict and judgment being against him he appealed to this court.

The cause was argued before BUCHANAN, EARLE, JOHNSON, and MARTIN, J. by

*Harper* and *Scott*, for the Appellant; and by
*Pinkney* and *Winder*, for the Appellees.

BUCHANAN, J. delivered the opinion of the court. It has been urged in argument on the part of the defendants, that the plaintiff, by his letter of instructions to *Peter Wirgman* of the 8th of May 1810, constituted him his supercargo or agent, and that he could not in that character prejudice the ship owners by any violation of his instructions, notwithstanding he was himself a part owner of the vessel; but was liable, if at all, only in his individual capacity. That question does not belong to the case, and is not necessary to be inquired into. The suit was brought, not for damages for a violation of instructions by *Peter Wirgman* as supercargo, but to recover a sum of money retained by the defendants, on account of freight, out of the proceeds of that part of the cargo which was the property of the plaintiff. The only question is, whether freight was earned or not? And that question lies within a narrow compass. The contract between the parties to this suit, is to be collected from the charter party, the bill of lading, and the agreement of the 14th of May 1810 is, that the goods shipped by the plaintiff shall not be landed on the Island of *Sylt*, but at some permitted port on the continent of *Europe*, before any freight shall be earned; but in the event of the whole of the ports on the continent being shut, then, and not otherwise, the defendants shall be entitled to freight on the goods being landed in *England*, with a stipulated addition. By the term "*shut*," as here used, is meant an occlusion, by the municipal regulations of the country; and unless in that sense of the term all the ports of the continent of *Europe* were closed, the vessel could not earn freight by going to *England*, unless the plaintiff by some act of his has made

himself liable. And it is said that he has so made himself liable; that the letter of instructions to *Peter Wirgman*, of the 8th of May 1810, vested in him, as agent, a discretion to do whatever in his opinion would be most to the interest of the plaintiff, in the event of his being prevented by the situation of affairs in *Europe*, from communicating with the Messrs. *Parish & Co.* and entitled the ship owners to freight, on the cargo being landed, in the honest exercise of that discretion, at *Hull* in *England*, which it is contended, is a port in the *North Sea*, within the meaning of the charter party and bill of lading. That paper being of anterior date, must be considered as revoked by the agreement of the 14th of May 1810, so far as it may contain any thing inconsistent with that instrument; but on an attentive examination it will be found to give no such discretion. *Peter Wirgman* by it is referred for his government to a letter of the same date from the plaintiff to the Messrs. *Parish & Co.* in which they are expressly instructed, that "the ship is not discharged from her freight until the cargo is landed in a port on the continent of *Europe*," thus tying down the ship-owners, in relation to the freight to be earned, to a delivery of the goods at some port on the continent. These two letters, taken together, and not that to *Peter Wirgman* alone, must be understood as furnishing his instructions. But it is argued, in relation to the letter to the Messrs. *Parish & Co.* so far as it respects a delivery of the goods at a port on the continent, that the plaintiff had no power, by any instructions either to the *Parishs* or to his supercargo, to deprive the defendants of rights acquired under the charter party, or to control the general voyage, in which other shippers were concerned. The answer to that is, that the ship-owners had a right to make any other contract they pleased with the plaintiff, varying or annulling the charter party, in relation to his part of the cargo. They did enter into a subsequent separate agreement with him, to which we must look for the rights of the parties. In that instrument the stipulation that no freight shall be earned by landing the cargo in *England*, unless all the ports on the continent of *Europe* should be shut, is just as explicit as the agreement not to land the goods on the Island of *Sylt*. It may therefore as well be said, that the defendants would have been entitled to freight on the goods being landed at *Sylt*, as in *England*; and it has not been contended that freight could have been earned by landing them at *Sylt*, though by the terms of the charter party they might eventually have been *landed* at that port. Hence it is not material to this case, what the true meaning of the charter party is, or what would have been the rights of the parties under that instrument as it originally stood. But admitting, for a moment, that the letter of the 8th of May to *Peter Wirgman* did give him the eventual discretion contended for, whether the contingency happened or not, on which the discretion was to arise, was a question for the consideration of the jury, and perhaps the judge stepped

1819

Hactes
vs
Wirgman

aside in saying that it did. *Wirgman* was bound to seek a communication with the Messrs. *Parish & Co.* and to obey their instructions, and was not tied down to a communication from *Sylt* only, which is merely mentioned as a convenient point of intercourse; and to show that he was not prevented from communicating with them, seven letters that passed between them were offered in evidence, two of which were from the *Parishs* to him. In their first letter of the 2d of October 1810, they request information concerning the cargo consigned to them, and by whom, and suggest difficulties respecting the future destination of the vessel, in the event of her being liberated, but say there will be time enough to correspond on that subject, after being informed of the cargo on hand; at the same time telling him what course had been pursued by several of their friends. And in their letter of the 30th of the same month, they instruct him, in the event of condemnation, to proceed to *Copenhagen* to prosecute an appeal; inform him of recent *French* and *Danish* decrees respecting colonial produce, and of the heavy duties imposed in *Hamburg* and *Holstein*, and speak of the difficulty at that time of pointing out a proper port of discharge, but promise to keep him informed of the state of affairs. To their avoiding to give positive directions touching the future destination of the ship, before she was liberated, no objection can be taken. But what was the course pursued by *Peter Wirgman?* In his letter of the 8th of November he advised the Messrs. *Parish & Co.* that the vessel had been released on the 5th, and that it was his determination to discharge the cargo in *Flekkefiord*, and without waiting for instructions; and as if to prevent any, in his last letter of the 10th of the same month, only two days later, he informed them that it was his intention to commence unloading on the Wednesday following; and afterwards, without consulting them on the subject, or giving any intimation of his intention, sailed for *Hull* in *England*, where he landed the cargo. It was his duty, after advising the *Parishs* of the liberation of the vessel, to wait at least a reasonable time, for their directions; and if he either declined, or by any improper act of his, prevented their further interference, he thereby violated his instructions, and removed the only ground on which the claim of discretion could rest. The judgment of the county court cannot in any view of the subject be sustained. Whether it would or would not have been expedient to attempt the landing of the cargo on the continent, was not a matter to be inquired of by the jury. The only question properly before them was, whether the whole of the ports on the continent of *Europe*, were by municipal regulations closed against the admission of the goods of the plaintiff which were on board the ship *William Wilson?* If they were, the vessel earned freight by going to *England;* if on the contrary any of them were open to such goods, the defendants had no right, under the stipulations in the agreement, to charge freight on landing them in *England,* and the plain-

1819.

Mactier
vs
Wirgman

tiff is entitled to recover any sum of money retained by them on that account, notwithstanding the distracted state of *Europe* might have rendered it hazardous to seek such open ports.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.